**PIPELINE CONTRACTORS, INC.,**

      **Plaintiff,**                      **CASE NO.:   3:14-cv-01030 MMH-MCR**

**v.**

**INTERNATIONAL FIDELITY**
**INSURANCE COMPANY,**

      **Defendant.**

_____/

**INTERNATIONAL FIDELITY INSURANCE COMPANY'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

Defendant International Fidelity Insurance Company ("IFIC"), by and through its undersigned counsel, and pursuant to Rule 56, Federal Rules of Civil Procedure, and Local Rule 3.01(a), hereby requests this Court to grant partial summary judgment in its favor against Plaintiff Pipeline Contractors, Inc. ("PCI"). PCI failed to cure a prior material breach of the subcontract with Breaking Ground Contracting Company ("BGC"), which justified BGC withholding payments under the terms of the subcontract and terminating PCI for cause due to PCI's total abandonment of the project. Partial summary judgment in favor of IFIC should be granted as a matter of law based upon the undisputed material facts as set forth herein, leaving only a determination of damages, if any due to PCI, under the terms of the subcontract.

## I.   **INTRODUCTION**

This case arises from IFIC's role as payment bond surety to Breaking Ground Contracting Company for a project known as the Convoy Fire Live Entry Point - Re-Bid (the "Project") for the State of Florida Department of Military Affairs ("DMA"). The Project was located on Camp Blanding, Starke, Florida. In or around July 2012, BGC was awarded the

contract for the Project as the general contractor. BGC executed the contract with DMA on or about September 27, 2012.[1] In or around October 2012, BGC subcontracted with PCI for the civil and site work for the Project. PCI's scope of work on the Project was by far the largest portion of the entire Project BGC had been awarded. As a result, PCI's diligence and cooperation in performing its contractual obligations would be necessary for the successful completion of the Project.

After work commenced, BGC began to experience difficulties with PCI's performance on the Project. As of April 2013, PCI had still failed to provide required submittals for materials it intended to incorporate in the Project. By the summer of 2013, PCI had failed to properly staff the Project in order to complete its scope of work. The architect and engineer of record on the Project rejected PCI's proposed materials and work, leading to reductions in BGC's pay applications. By mid-October 2013, PCI had stopped working on the Project altogether, despite work being available. Additionally, PCI still had not obtained final approval of submittals for certain key materials for its scope of work, namely, coarse aggregate and berm mix material,[2] due to its refusal to comply with the architect's and engineer's binding decisions.

As a result of PCI's failures to comply with the contract documents, BGC issued three separate Notices of Default to PCI and exercised its right to withhold payments to PCI due to PCI's defaults. Beginning in late October of 2013 PCI completely abandoned the Project. BGC

---

[1] The Project was unique for several reasons. First, the project site was along an approximately 26 mile road on a military installation, making access, security and safety key issues. Second, the construction activities were taking place on a target range where live ammunition could be used at any time. Thus, access to the range for construction was controlled by Camp Blanding and construction activities could be stopped to accommodate training activities, regardless of the construction schedule. Third, each objective could be viewed as an individual construction project. For example, work could be performed on one or more objectives simultaneously while no work could be occurring at other objectives, whether due to range access restrictions or other factors. Additionally, there was road work which could also take place throughout the project site.
[2] The Project involved, among other things, the creation of objectives used for military training using live weaponry. Each objective had berms surrounding each target as a means for protecting property and personnel from injury due to ricochet from .50 caliber bullets. As a result, the berms were designed to be composed of a certain mix of materials.

ultimately issued a final Demand to Cure to PCI and facilitated meetings with the Project architect, engineer, PCI and PCI's performance bond surety in an effort to pressure PCI into fully remobilizing on the Project and complete its work. Rather than fully remobilizing on the Project and demonstrating sufficient progress to cure its default, PCI returned to the Project with insufficient forces and for only three work days before once again abandoning the Project for alleged non-payment. BGC then terminated PCI for cause and called upon PCI's surety to complete PCI's scope of work. When PCI's surety failed to do so, BGC engaged a completion subcontractor to complete PCI's scope of work. PCI submitted a payment bond claim to IFIC which denied the claim due to PCI's prior material breach of the subcontract between BGC and PCI. PCI then filed this action.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      BGC is a general contracting company which was awarded a contract with the State of Florida Department of Military Affairs for the Project. Complaint at ¶ 4-5 (Doc 2-1). The original number of days in the contract was 300 days. Affidavit of Mary Tappouni, President,  Breaking Ground Contracting ("Ma. Tappoui Aff.") at ¶ 4.

2.      Bhide & Hall Associates, Inc. ("BHA") was the Architect for the Project commissioned by DMA for its planning, design and construction administration. Deposition of E. Wendell Hall ("Hall Dep.") at 13:17-25, 14:1-21 and Exh. 123. E. Wendell Hall was the Architect of Record for the Project. *Id.* at 12:5-19. Michele A. Agee, P.E. of Michele A. Agee, P.E., P.A. ("Engineer") was the civil engineering consultant working with BHA on the Project. Hall Dep. at 16:23-25, 17:1-3; 23-25, 18:1-4.

3.      On or about July 31, 2012, PCI provided BGC with a bid for the civil/site work portion of the Project, which included BGC's bid price for the Project. Ron Denmark, as

President of PCI, submitted the bid proposal to BGC. Rule 30(b)(6) Deposition of Pipeline Contractors, Inc./Ron Denmark, President[3] ("PCI Dep.") at 28: 3-12 and Exh. 10.

4.      In its bid proposal, PCI acknowledged Addendum No. 2 to the bidding documents. PCI Dep. at 28:13-25, 29:1-2, Exh 10. PCI also stated its bid price included "the mixing of Berm with 10% Clay by volume in accordance with typical berm detail," "#57 Stone," and all testing for its scope of work. Exh. 10 at *1*. As president, Denmark provided the information for the proposal, prepared the calculations of the bid amount and was aware of what it contained. PCI Dep. at 20:20-25, 21:1-25, 22:1-3.

5.      After BGC was awarded the contract for the Project by DMA, BGC executed a contract with DMA as Contractor on the Project (the "BGC Contract"). Affidavit of Michelle Tappouni at ¶ 3 ("Mi. Tappouni Aff."), Exh A. The Contract Documents which comprised the BGC Contract included, among other things, the Non-Technical Specification Sections of Division One ("Project Manual") and the plans and specifications for the Project. Exh. A at Article 1. Section C-22 of the Project Manual stated that the General Conditions of the Contract for Construction, American Institute of Architects Document A-201, 2007 Edition, as modified shall apply to and form a part of the Project Manual. Mi. Tappouni Aff. at ¶ 5, Deposition of Margaret "Marney" Best ("Best Dep.") at 158:7-25 and Exh. 2. at 27.

6.      On October 3, 2012, BGC sent PCI, among other things, the plans and specifications for the Project documents. PCI Dep. at 40:3-13, Exh. 11. Included in this email was access to the Project Manual. *Id.*, Exh. 11 at 2. Ms. Best received a copy of the Project Manual along with the other divisions related to PCI's scope of work. Best Dep. at 158:7-25.

---

[3] Mr. Denmark appeared for deposition individually and as the corporate designee of PCI. PCI Dep. at 10:15-11:14.

7. On or about November 13, 2012, a pre-construction meeting was held at Camp Blanding for the purpose of providing important information to BGC and its subcontractors regarding the administration of the Project. PCI Dep. at 44:4-14, Exh. 12. PCI had two representatives at this pre-construction meeting, Ron Denmark and Marney Best. Exh. 12 at 3.

8. One of the key topics at the pre-construction meeting was the fact that the training of military troops would always take priority over construction activities. PCI Dep. at 44:15-23, Exh. 12 at 1. It was emphasized to those present at the meeting that the firing range schedule may impact access to certain areas of the Project site but that Camp Blanding's range control would try to issue a range schedule 45 days out, with flexible uncertainties. PCI Dep. at 44:24-25, 45, Exh. 12 at 1.

9. PCI entered into a contract with BGC for all the civil/site work on the Project (the "Subcontract"). PCI Dep. at 18:22-25, 19:1-3 and Exhibit 5. PCI and BGC negotiated certain terms of the Subcontract prior to its execution by PCI. PCI Dep. at 19:7-25, 20:1-8.

10. Article 1 of the Subcontract clearly identified the documents which comprised the Contract Documents which included the BGC Contract and all documents which comprised that contract. PCI Dep. at 63:13-24 and Exh. 5 at 1. Article 2 of the Subcontract described PCI's scope of work under the Subcontract and included a "scope analysis". Exh. 5 at 2-3. Article 4 described the terms and conditions under which payments would be handled. *Id.* at 4.

11. Part of PCI's scope of work was providing gravel for the Project. Best Dep. at 33:10-25; PCI Dep. at 92:21-24. Gravel is a material which PCI would have brought to the Project. Best Dep. at 33:10-25.

12. Addendum No. 2 provided that "Gravel shall be Coarse Aggregate as defined in Section 901 of the FDOT Standard Specifications. Coarse aggregate sizes may range from 3/4"

to 3" and shall be free of clay clumps, soft and friable particles, salt, alkali, organic matter and adherent coatings." PCI. Dep. at 88:24-25, 89:1-19 and Exh. 19.

13.     Section 901-1.1 of the FDOT Standard Specifications states that coarse aggregate shall be naturally occurring stone such as gravel. PCI Dep. at 90:3-25, 91:1-2 and Exh. 20.

14.     On or about April 25, 2013, PCI provided its submittal for coarse aggregate and identified #2 crushed concrete as the material it selected to meet the gravel specification. PCI Dep. at 94:22-25; 95:1-2 and Exh. 24. This submittal was rejected by the Engineer because crushed concrete is not a naturally occurring stone as required by Section 901-1.1. *Id.* at 95:3-11, Exh. 24 at 2. The Engineer required a resubmittal for the coarse aggregate. *Id.* at 95:12-17, Exh. 24 at 2.

15.     On April 26, 2013, PCI responded that it believed crushed concrete satisfied FDOT Section 901.1-5. PCI Dep. at 98:6-20 and Exh. 25. That same day, the Engineer issued its determination that because coarse aggregate for the Project would not be used for a nonstructural concrete application or a bituminous application, and specifically that crushed concrete did not meet the Project specifications. Deposition of Michele Agee, P.E. at 213:2-21 ("Agee Dep.") and Exh. 155. The request for a resubmittal in compliance with the specification was again made. Exh. 155 at 2. PCI was required to indicate the material being submitted. Agee Dep. at 228:16-229:4.

16.     PCI did not provide a formal submittal for coarse aggregate identifying a naturally occurring stone as required by Section 901-1.1 or the Engineer's interpretation of the Gravel Specification. Mi. Tappouni Aff. at ¶ 7. PCI did not contact any of its suppliers to inquire whether there was a naturally occurring stone available within the size range of 3/4" to 3". PCI

Dep. at 98:21-25, 99:1, 102:2-21. Instead, PCI continued to assert that crushed concrete met the Gravel Specification. *See* Exh. 155 at 1; Hall Dep. at 131:14-22.

17.     On May 7, 2013, BGC informed PCI that the Owner was deleting the road work related to EZ base and PCI responded it would provide a credit for that work. PCI Dep. at 203:10-20 and Exh. 119.

18.     In June 2013, work on the Project was suspended due to extensive training exercises being conducted at Camp Blanding. Mi. Tappouni Aff. at ¶8. PCI was aware of this temporary work suspension. PCI Dep. at 75:18-25, 76:1-2. PCI was also aware that it was to return to work as soon as work areas became available. *Id.* at 76:11-14. BGC informed all its subcontractors that work was to resume on June 17, 2013. Mi. Tappouni Aff. at ¶ 9. This instruction was acknowledged and agreed to by PCI. *Id.*

19.     Despite acknowledging that work would resume June 17, PCI provided a crew of only 5 men on the 21st and 1 man on the 29th for the remainder of June. PCI Dep. at 76:11-18, Exh. 108 at 14.

20.     On June 20, 2013, BGC communicated to PCI that DMA wanted a #57 stone submittal for the gravel. PCI Dep. at 101:3-13 and Exh. 94. This gradation of stone was requested because PCI had included #57 stone in its bid and on its schedule of values from which payments to PCI would be made by BGC. Mi. Tappouni Aff. at ¶ 10. PCI responded by asking additional questions related to the #57 stone. PCI Dep. at 104:7-23 and Exh. 95.

21.     On July 1, 2013, BGC again requested the #57 Stone submittal from PCI. PCI Dep. at 107:12-22 and Exh. 96.

22.     On July 11, 2013, a meeting was held with representatives from DMA, BHA and BGC, among others, regarding the progress of the Project. Hall Dep. at 125:22-25, 126:1-16 and Exh. 128.

23.     Between July 1 and 17, 2013, BGC sent PCI several emails regarding its non-compliance with its NPDES permit and its lack of manpower on the Project. PCI Dep. at 77:24-25, 78-81, 82:1-18 and Exh. 92 and 93. BGC also indicated several areas of work which were being impacted by PCI's failure to properly man the Project. Exh. 92 at 1.

24.     On July 19, 2013, BGC issued its first 48 Hour Notice to Cure to PCI pursuant to Article 10.3 of the Subcontract, outlining deficiencies in PCI's performance including lack of manpower on the Project, failure to provide required submittals for #57 stone, the failure to provide materials to the Project and the failure to properly communicate and coordinate with BGC. PCI Dep. at 84:7-25, 85:1-7 and Exh. 35 ("7/19/13 48 Hour Notice"). BGC requested a written plan from PCI outlining how it intended to fulfill its obligations pursuant to the Subcontract. Exh. 35 at 3.  No written plan was provided by PCI in response to this Notice. Mi. Tappouni Aff. at ¶ 11.

25.     On August 5, 2013, a meeting was held between representatives of BGC and PCI in an attempt to resolve the issues raised in the 7/19/13 48 Hour Notice. PCI Dep. at 116:9-25, 117:1-7 and Exh. 37. During this meeting, BGC noted that, among other things, PCI still had not provided a complete submittal on coarse aggregate and had not provided a written action plan as required by the 7/19/13 48 Hour Notice. PCI Dep. at 119:15-25, 120-121:1-14 and Exh. 37. The issue of the berm mix and testing of same was also discussed. Exh. 37.

26.     On August 12, 2013, the Architect sent BGC an email indicating that the Engineer had determined that the berm material placed by PCI at Objective 3 did not meet the

Specifications. Hall Dep. 136-138:1-10 and Exh. 3. The Architect stated that if the site work contractor was unwilling or unable to comply with the plans and specifications, it may be necessary to find another. Exh. 3 at 1.

27.     On August 14, 2013, PCI sent an email to the Architect, asserting that it was not aware that the Gravel Specification called for only natural stone when it bid the Project and asserted that there had been a compensable change to the specifications due to the Owner's request for #57 stone. PCI Dep. at 164, 165:1-10 and Exh. 109. The Architect did not agree that a change order was required and opined that PCI may not have bid the gravel part of the Project in compliance with the plans and specifications. Exh. 109 at 3.

28.     On August 20, 2013, the Architect responded to PCI's email by letter to BGC, indicating no change had been made to the Specifications and PCI's "apparent lack of understanding" of the plans and specifications for the Project may seriously impact the Project's progress which may lead to the need to replace PCI with another civil/site contractor. Hall Dep. at 132:21-133:16, 134:1-8. and Exh. 110. The Architect did not believe that PCI was performing on the Project and believed PCI was being intransigent. Hall Dep. at 134:9-23.On August 21, 2013, BGC again requested PCI provide a credit for the work deleted from the BGC Contract related to EZ Base. PCI Dep. at 204:22-207:23 and Exh 120.

29.     On September 5, 2013, BGC notified PCI that the engineered fill at the berm for Objective 3 was placed without an approved test report in direct violation of the specifications and the Engineer's report dated August 8, 2013. PCI Dep. at 133:23-25, 134:1-19 and Exh. 102. BGC also notified PCI there were improper organics in the berm mix. Exh. 102 at 2. BGC indicated both of these issues required correction. *Id.* PCI responded by letter asking additional questions about the specifications. PCI Dep. at 136-139, 140:1-11 and Exh. 103.

30.     Between September 13 and 25, 2013, BGC sent several requests asking PCI to respond to its requests for a submittal on #57 stone at the water crossing and for test reports regarding the berm mix at Objective 3 because these items were delaying the payment application to be submitted to DMA and the Architect. Best Dep. at 119:17-25, 120:1-13 and Exh. 38.

31.     On September 25, 2013, BGC informed PCI that its August pay application was being reduced and revisions were required. Exh. 38 at 1. PCI's pay application was reduced due to the Architect's rejection of billing for #57 stone and the berm mix for Objective 3. *Id.*

32.     Between September 24 and September 27, 2013, BGC and PCI exchanged additional emails regarding the berm mix and the amount of clay required to meet the specifications and the design intent of the typical berm detail. Best Dep. at 121:3-22 and Exh. 39. BGC reiterated that the Engineer did not approve the berm mix based upon test reports provided by PCI. Exh. 39 at 3.

33.     On October 3, 2013, BGC issued its second 48 Hour Notice to PCI. PCI Dep. at 149-150:1-16 and Exh. 84 (the "10/3/13 Notice"). The 10/3/13 Notice raised similar performance issues to the 7/19/13 Notice, such as the #57 stone submittal and action plans regarding PCI's performance of the work which had still not been received. Exh. 84. The substantiation of the berm mix report and the credit for all road work related to the existed EZ base were also issues raised in the 10/4/13 Notice. *Id.*

34.     As of October 2013, there were areas of work throughout the Project site available to PCI. Deposition of Michelle Tappouni ("Mi. Tappouni Dep.") at 115:25-116:10, 117:18-24, 118:12-21; 119:5-11, 120:2-12.

35.     On October 10, 2013, a meeting was held with representatives of BGC, PCI and the Architect in an attempt to resolve the gravel and berm mix issues. Hall Dep. at 140:8-25; 141:1-10 and Exh. 45. No resolution was reached. Exh. 45 at 2. The Architect provided PCI with its interpretation of the berm mix specification but PCI was unwilling to accept it. Hall Dep. at 141:12-21. The Engineer's interpretation of the gravel specification was also discussed at the meeting. *Id.* at 141:3-6. PCI was unwilling to accept the Engineer's interpretation of the gravel specification. *Id.* at 141:8-11. On October 11, 2013, BGC followed up this meeting with a letter to PCI outlining the performance issues still outstanding for PCI. Best Dep. at 137:9-21 and Exh. 46.

36.     After October 14, 2013, PCI had a very small workforce on the Project and eventually stopped working the Project altogether for the remainder of October. PCI Dep. at 161-162:1-18 and Exh. 108 at 37.

37.     By October 15, 2013, PCI had received payments from BGC for its payment applications No. 1 through 6. *See* Doc. 2-8 at 2 (Exh. H to the Complaint).

38.     On October 17, 2013, BGC informed PCI that revisions to its payment applications for the period ending September 30, 2013 were required. Best Dep. at 122:1-25 and Exh. 40.

39.     On October 17, 2013, BGC received payment from the State of Florida for its pay application through August 30, 2013. Affidavit of Mary Tappouni ("Ma. Tappouni Aff.") at ¶ 5. As of this date, PCI had not resubmitted its August 2013 pay application and BGC had not yet received payment from the State of Florida for its pay application through September 30, 2013. *Id.* at ¶ 6.

40.     On October 22, 2013, PCI finally submitted its revised August 2013 and September 2013 payment applications to BGC. Best Dep. 124-25:1-8 and Exh. 41.

41.     On October 24, 2013, BGC issued its 72 Hour Demand to Cure pursuant to Article 11.2 of the Subcontract, identifying the persistent and repeated failures of PCI to perform and stating its payment for the revised August payment application would be withheld pursuant to BGC's rights under the Subcontract until the failures were cured ("Demand to Cure"). PCI Dep. at 160:10-161:1, Exh 43. Additionally, BGC notified PCI that a written plan was required outlining how it intended to fulfill its contract obligations or be declared in material breach of the Subcontract. *Id*.

42.     As of October 24, 2013, PCI had not fully staffed the Project since October 14, 2013. Exh. 108 at 37.

43.     On November 1, 2013, PCI sent BGC a letter regarding the berm mix issue, stating that it believed the Architect had made a change to the Specifications which required a change order because of the increased cost. Best Dep. at 142:12-19 and Exh. 50.

44.     On November 6, 2013, BGC sent another notice to PCI regarding its continued failure to cure its performance issues outlined in the Demand to Cure. PCI Dep. at 171:15-24 and Exh. 113. Additionally, BGC indicated that PCI had no manpower on the Project and there was no indication that PCI was returning to the Project. Exh. 113 at 1.

45.     As of the November 7, 2013 progress meeting, the berm at Objective 3 still had fouled material on it which was previously noted as needing correction on October 14, 2013. Hall Dep. at 155:25-157:9 and Exh. 134 at 2.

46.     On November 14, 2013, a conference call was held between BGC, PCI and a representative of PCI's performance and payment bond surety. PCI Dep. at 175:17-25,176-77:1-

8 and Exh. 116. BGC followed up the conference call with a letter outlining what PCI was required to do to be in compliance with the Subcontract. Exh. 116 at 1. BGC specifically raised the #57 stone submittal, the berm mix, remediation of the berm at Objective 3, the EZ base credit and correction of permit violations. *Id.*

47.    From November 1 through November 22, 2013, PCI performed no work on the Project. PCI Dep. at 168:25, 169:1-8 and Exh. 108 at 37.

48.    On November 22, 2013, a conference call with BGC, BHA, PCI and PCI's surety representative took place to discuss getting PCI back to work to move the Project forward. PCI Dep. at 177:9-25, 178:1-5 and Exh. 54. The Architect agreed to accept what PCI could provide regarding the berm mix as an accommodation to PCI to get the Project moving. Hall Dep. at 206:16-25. BGC and PCI exchanged emails related to its return to work on the Project, BHA's interpretation of the berm mix and the test reports. Exh. 54. In an email written by Ron Denmark to follow up on the conference call, payment by BGC was not stated as a condition of its return to work on the Project. *Id*. at 2.

49.    Later that day, BGC and PCI's project manager met and discussed PCI's returning to work on November 25, 2013. Best Dep. at 148. Also, BGC sent PCI a Project schedule, detailing the work planned for the next four weeks. Best Dep. at 148 and Exh. 55.

50.    On November 25, 2013, PCI worked on Objective #6. Best Dep. at 140-41 and Exh. 48 at 1. PCI was not able to work due to rain on November 26, 2013. Exh 48 at 2. On November 27, 2013, PCI worked at Objective #6 again. *Id*. at 3.

51.    Between November 25 and December 2, 2013, BGC and PCI exchanged emails related to a discussion about PCI's revised August pay application. Best Dep. at 149:10-25, 150:1-2 and Exh. 56. BGC stressed that one week of consistent productive work needed to be

performed by PCI to cure its defaults before the payment for the August draw would be made. Exh. 56 at 1 and 3; Mi. Tappouni Dep. at 175:23-176:7. BGC also stated receipt and review of the berm mix process/testing for the remainder of the Project was required. Exh. 56 at 1.

52.    On December 2, 2013, PCI worked on Objective #6. Best Dep. at 153:13-17 and Exh. 58 The next day, PCI removed its equipment from the Project site. Exh. 58 at 2. Ron Denmark on behalf of PCI instructed his men to remove the equipment. PCI Dep. at 186:11-16. That was the last day PCI performed work on the Project.

53.    On December 3, 2013, Pipeline sent BGC a letter declaring it in breach for failure to pay. PCI Dep. at 186:17-25, 187: 1 and Exh. 60. On December 5, 2013, BGC sent PCI a letter terminating it from the Project for cause. PCI Dep. at 201:20-25, 202:1-10 and Exh. 69.

54.    PCI submitted its payment applications No. 10 for period ending November 30, 2013 and 11 for period ending December 3, 2013. PCI Dep. at 187:14-17. Payment application No. 10 was reduced by the Architect and Payment application No. 11 was rejected by the Architect in its entirety. PCI Dep. at 187: 18-25, 188: 1-17 and Exh 61.

55.    BGC contracted with J.B. Coxwell Contracting, Inc. to complete PCI's scope of work. Mi. Tappouni Dep. at 149:24-25.

## III.    LEGAL ARGUMENT

### A.    Standard on Motion for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). Furthermore, a movant is entitled to summary judgment where the record, taken as a whole, could not lead a rational trier of fact to find for the non-movant. *See Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). Summary judgment is a "necessary procedural tool, that makes it possible to promptly dispense of causes of action on the merits, if in essence there is no real dispute as to the salient facts." *Celotex*, 477 U.S. at 322. There are no genuine issues of material fact that PCI had materially breached its Subcontract so BGC was within its rights under the Subcontract to withhold PCI's payment until such time as the breach was cured. PCI's repeated abandonment of the Project which culminated in December 2013 was not proper and led to its proper termination for default by BGC. As a result, BGC did not materially breach the Subcontract due to non-payment and the claim under the payment bond issued by IFIC fails. Thus, summary judgment is proper in favor of IFIC.[4]

B. PCI's Contract Documents must be read together to derive entire agreement.

The interpretation of contractual provisions between general contractors and subcontractors is a question of law, not fact. *Peacock Const. Co., Inc. v. Modern Air Conditioning, Inc.*, 353 So.2d 840, 842 (Fla.1977). When reviewing the contract, "the court must review the entire contract without fragmenting any segment or portion." *J.C. Penney Co., Inc. v. Koff,* 345 So.2d 732, 735 (Fla. 4th DCA 1977). Each provision in a contract "should be given meaning and effect and apparent inconsistencies reconciled if possible." *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938, 941 (Fla.1979); *Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Company,* 215 So.2d 336 (Fla. 4th DCA 1968). Generally, where documents are sufficiently identified in a contract, those documents are made a part of the contract and are to be interpreted altogether. *Henderson v. International Fidelity Insurance*

---

[4] Because it stands in the shoes of its principal, a surety can assert the defenses of the principal to a claim by a claimant under a payment bond. *C.A. Oakes Constr. Co., Inc. v. Ajax Paving Indus. Inc.,* 652 So.2d 914, 916 (Fla. 2nd DCA 1995); *Team Land Development, Inc. v. Anzac Contractors, Inc.,* 811 So.2d 698, 700 (Fla. 3d DCA 2002) (As a general matter, a surety is afforded the defenses of its principal.) A surety's liability is coextensive with its principal. *Am. Home Assur. Co. v. Larkin Gen. Hosp., Ltd.,* 593 So.2d 195, 198 (Fla.1992); *OBS Co., Inc. v. Pace Const. Corp.,* 558 So.2d 404, 407 (Fla.1990). Further, pursuant to section 14.9 of the Subcontract, the surety is an express third party beneficiary entitled to all claims and defenses of BGC. Exh. 5 at 10.

*Company,* 575 So.2d 770, 771 (Fla. 5th DCA 1991). Courts are required to read the provisions of a contract in harmony with each other in order to effect to all of its provisions. *City of Homestead v. Johnson,* 760 So.2d 80, 84 (Fla. 2000).

In this case, it is undisputed that Pipeline's Subcontract consisted of the Subcontract and the BGC Contract, including, among other things, the Project Manual and the A-201 as modified for the Project. Mi. Tappouni Aff., Exh. A at 1; Exh. 5 at 1. Each of these documents imposed obligations upon PCI which it was required to comply with during its performance of the Subcontract. These documents are to be read in harmony with each other when determining Pipeline's contractual obligations. *See Johnson,* 760 So.2d at 84.

Article 4.1 of the Subcontract allows BGC to withhold payments to PCI on the same basis that the Project owner could withhold payments from BGC. *See* Exh. 5 at 4. Specifically, Article 4.1 states: "Contractor is authorized to deduct and withhold from any payment due Subcontractor any and all amounts that Owner or Prime Contractor may withhold from Contractor pursuant to the Prime Contract(s) or by any law, rule or regulation of any governmental agency." Exh. 5 at 4 (the "4.1 Language"). According to the Project Manual, payments to BGC could be withheld and prior certificates for payment can be nullified upon, among other things, its repeated failure to carry out the work in accordance with the Contract Documents. Exh. 2 at 27 and Mi. Tappouni Aff., Exh. B at 24. Once the reasons for withholding payment are removed, the payment should be made. Mi. Tappouni Aff., Exh. B at 24. In this case, there were repeated failures by PCI to carry out the work in accordance with the Contract Documents, leading to BGC's exercising its authority under the Subcontract to withhold payment to PCI. PCI never fully cured the reasons its payments were withheld.

While PCI may not have realized the import or effect of agreeing to the 4.1 language, the

court is not at liberty to redraft contracts and must enforce its terms. Applying Florida law, the Eleventh Circuit held that the function of the courts was not to "rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain." *Marriott Corp. v. Dasta Construction Co.,* 26 F.3d 1057, 1068 (11th Cir. 1994) (citation omitted). The 4.1 Language gave BGC authority to withhold payments from PCI due to its breaches of the Subcontract and its repeated failure to perform in accordance with the Contract Documents. Further, it is axiomatic that when a contract is breached by one party, the other party is relieved of its obligation to perform. *Miller v. Reinhart*, 548 So.2d 1174, 1175 (Fla. 4th DCA 1989). Thus, PCI's prior uncured material breaches of the Subcontract relieved BGC of its obligation to make payment until such time as PCI performed in accordance with the Subcontract documents.

      C.   <u>PCI Materially Breached the Subcontract</u>

          i.   <u>PCI's Failure to Properly Staff the Project</u>.

In its Subcontract, PCI agreed that time was of the essence in the performance of the Subcontract and to perform "the Work promptly, efficiently and at a speed that will not cause delay or disruption to the Work of Contractor, any other subcontractor, Owner or any others working on the Project.". Exh. 5 at 7-8. PCI also agreed that BGC may require PCI "to schedule, reschedule and prosecute various elements of the Work in preference to other parts of the Work and in so doing may vary any previously fixed schedule, sequence or plan of coordination applicable to the Work… ." *Id.* at Article 10.1. PCI agreed it was to provide adequate labor and supervision required to comply with BGC's established work schedule and that "multiple mobilizations will be required and are to be included in this scope of work". *Id.* at 2-3. BGC had the right to demand strict compliance with these provisions of the Subcontract and PCI had the

obligation to comply. *Id.* at Article 14.4. However, PCI materially breached the Subcontract when it failed to prosecute the work in accordance with BGC's directions as required by the Subcontract.

Due to a large training exercise at Camp Blanding during June 2013, BGC made the determination to close down the Project for two weeks and to remobilize on June 17, 2013. Mi. Tappouni Aff., ¶ 8. PCI knew that construction activities were being stopped and that it would be required to return to the Project on June 17, 2013. PCI Dep. at 75:18-25, 76:11-14. PCI failed to comply with the Subcontract when it did not return to the Project on June 17 as directed by BGC. PCI only worked one full day in June 2013. Exh. 108 at 14. PCI admitted that it did not return to the Project in June 2013 as required. *See* PCI Dep. at 76:14-16. PCI failed to comply with Subcontract requirements and was in material breach.

In July 2013, PCI worked on the Project sporadically which led to BGC's emails regarding PCI's lack of manpower on the Project and the negative impact of its failure to prosecute its work. Exh. 92 and 93. PCI's failure to respond or to properly staff the Project was one of the factors leading to the 7/19/13 48 Hour Notice. Exh. 35.

In October 2013, PCI again failed to properly staff the Project. After October 14, 2013, PCI only had men on the Project for another 3 days in October and on two of those days, only one man worked. Exh. 108 at 37. PCI had stopped working on the Project despite having the areas of work available to it. *See* Mi. Tappouni Dep. at 115:25-116:10, 117:18-24, 118:12-21; 119:5-11, 120:2-12. At this point in time, it is undisputed that PCI had been fully paid for the approved payment applications it had submitted to BGC for which BGC had received payment from the State of Florida. *See* Doc. 2-8 at 2. As of October 15, 2013, no payment was due PCI because it still had not submitted its revised payment application for the period ending August

30, 2013 or September 20, 2013 <u>and</u> BGC had not been paid by the State of Florida for its August or September 2013 payment applications. *See* Exh. 41 and Ma. Tappouni Aff. at ¶ 5. With work available within the scope of its Subcontract and remedial work to complete, PCI had no valid basis to stop working on the Project in October 2013.

PCI lost windows of opportunity to perform productive work on the Project and to move its scope of work forward. Hall Dep. at 59:9-19. PCI also had other work available which did not involve the berm mix or gravel specifications issues. *Id*. at 144:16-145:6. Additionally, had the berm mix and gravel specification issues been resolved, PCI could have moved forward with those areas of work. *Id.* at 157:13-23. Due to PCI's failures to perform, as of the end of October, 2013, the Architect did not believe that PCI was performing adequately or in conformance with the contract documents. *Id.* at 145:11-15. PCI's continued failure to perform its work was a material breach of its Subcontract because time was of the essence of PCI's performance of the work. *See* Exh. 5 at 7. The work stoppage in October 2013 illustrated PCI's absolute failure to perform, complete in every respect, all things necessary to complete the Civil/Site scopes of work in accordance with the Subcontract and the contract documents. *See id.* at Article 2.1.

PCI's complaints that it could not move forward without payment ring hollow. First, no payment was due PCI for its revised August 2013 payment application when it stopped working. Under Florida law, "unexpected difficulty, expense, or hardship does not excuse a party from performance of its obligations under a contract." *Marshall Const., Ltd. v. Coastal Sheet Metal & Roofing, Inc*., 569 So.2d 845, 848 (Fla. 1st DCA 1990) (citation omitted) (subcontractor's failure to return to project unless it was paid for work already completed was a material breach of the contract). Further, in order to maintain an action for breach of contract, performance of its part of the contractual obligations imposed by the contract must be shown first. *See id.*

Here, PCI did not perform its contractual obligations regarding properly staffing the Project, correcting defective work and diligently prosecuting the work, including following the Architect and Engineer's interpretations of the plans and specifications. At the time payment for its August pay application may have become due, PCI was in material breach of numerous contractual obligations, triggering BGC's authority under the Subcontract to withhold payments to PCI. Its final abandonment of the Project in December 2013 was wrongful because its obligation to perform in strict compliance with the Subcontract had never been excused nor had PCI fully cured its material breach of the Subcontract. *Id.* PCI cannot maintain a breach of contract claim or a payment bond claim under the undisputed facts of this case. As a result, summary judgment should be granted in favor of IFIC.

      ii.   <u>PCI's Repeated Failure to Abide by Project Architect and Engineer's Interpretation of the Contract Documents</u>

A key provision in the Subcontract at issue in this case was:

> 2.3    **Owner/Architect/Engineer Interpretations.** The decision of Owner or Architect/Engineer as to the proper construction and interpretation of plans, specifications and other portions of the Subcontractor's Work, and as to whether or not Subcontractor has complied therewith, **shall be final and binding on Subcontractor**. Contractor may challenge or otherwise object to any such decision as provided under the terms of the Prime Contract(s), but shall not be obligated to do so.

Exh. 5 at 2 (emphasis added). PCI agreed to this provision of the Subcontract. PCI Dep. at 52:13-53:6. Inexplicably, PCI testified that it was not bound by the interpretation of the Architect. *Id*. at 102:22-103:9. PCI is wrong. By agreeing to the language of Article 2.3, PCI agreed that the Architect/Engineer's decision as to the proper construction and interpretation of the plans, specifications and other portions of its work and whether it has complied was final and binding upon it.

Under Florida law, when parties to a contract agree by its express terms to be bound to the determination made by an architect, that agreement is binding and absent fraud, or

mistakes amounting to fraud, the architect's determination is final. *James A. Cummings, Inc. v. Young*, 589 So.2d 950, 954 (Fla. 3d DCA 1991). "Where the language of a contract is clear and unambiguous, a trial court is not at liberty to modify the agreement and therefore must give effect to its express provisions." *Dickerson Fla. v. McPeek*, 651 So.2d 186, 187 (Fla. 4th DCA 1995); Here, PCI agreed to be bound by the interpretations of the Owner, Architect or Engineer. *See* Exh. 5 at 2. It was required to abide by those interpretations and was subject to the Architect or Engineer's determination of whether PCI was in compliance. *Id.* As of the end of October, 2013, the Architect did not believe that PCI was performing adequately or in conformance with the contract documents. *Id.* at 145:11-15. The Architect's determination as to PCI's non-performance is final. PCI's persistent failure to implement the interpretations of the Architect and the Engineer negatively affected the Project and PCI's lack of adequate performance as determined by the Architect was a material breach of the Subcontract.

## 1.    Gravel Specification Issue

PCI believed crushed concrete met the Gravel Specification and submitted information on this material for approval. Exh. 24. On April 26 2013, the Engineer determined crushed concrete did not meet the Gravel Specification, indicated that natural stone met the specification and required a resubmittal for gravel. *Id.* Rather than providing a material submittal complying with the specification as interpreted by the Engineer, for the next seven months, PCI questioned why crushed concrete was rejected, protested when asked to submit on #57 stone, which was the material included in its bid and its schedule of values for payment, and submitted requests for a change order for a perceived change in the specifications. The Architect rejected PCI's request for change orders on two different occasions. Exh. 109 at 2-3 and Exh. 110. The resolution over PCI's misinterpretation of the

Gravel Specification was not reached until November 2013 after PCI finally provided a submittal on #57 limestone without qualifications as requested by the Owner. Exh. 112 at 6. This submittal was provided nine months after PCI began work on the Project[5] and after PCI had not been working on the Project for weeks. *See* Exh. 62 at 2 and Exh 108 at 37. During numerous months taken to resolve this material submittal, work requiring the gravel could not move forward. *See* Hall Dep. at 143:13-25, 144:1-5. PCI's persistent refusal to accept the interpretations of the Architect/Engineer on this issue negatively impacted the Project. *Id.* at 139:18-140:7. This repeated failure to perform in accordance with the Contract Documents was a material breach of the Subcontract and provided BGC one of the grounds for its authorization to withhold PCI's payment on the Project. *See* Exh. 5 at Article 4.1.

## 2. Berm Mix Detail Issue

PCI's scope of work included creating berms in front of the walls protecting the targets at the objectives. *See* Exh. 5 at 2. The berms were designed to prevent .50 caliber ammunition from hitting the concrete wall, causing harm to personnel and property. Exh. 3 at 1. The Typical Berm Detail shown on the Project plans indicated berm mix (by volume): Clay 10% (max) 90% Imported Fill and Reclaimed Existing Soils 90%. Hall Dep. at 26:21-27:12. PCI's bid proposal submitted to BGC on or about July 31, 2012 stated it included "mixing of Berm with 10% Clay by volume in accordance with the typical berm detail". Exh. 10. Clearly, at the time of bidding, PCI knew of the requirement of a berm mix with 10% Clay by volume and included that work in its bid proposal and its contract price. However, that knowledge was not employed by PCI when performed its work.

---

[5] The Engineer testified she was concerned about the timeliness of PCI's submittals throughout the time it was on the Project. Agee Dep. at 150:21-151:17.

Rather, in or around August 2013, PCI began installing berm mix at Objective 3 which had not been approved and did not meet the plans and specifications as determined by the Architect and the Engineer. *See* Exh. 3. PCI believed its testing reports were sufficient to meet the Plans. *See* Exh. 36. However, the Architect disagreed and determined that the clay content should be 9-10% with the remainder being imported fill and reclaimed existing soils. Hall Dep. at 150:15-24 and Exh. 131. This determination by the Architect was disputed by PCI who opined that this interpretation was a change to the Plans which required a change order and additional compensation. Exh. 50. However, the Architect determined that no change had been made to the specifications related to the berm. Hall Dep. at 155:15-18. As indicated by its bid proposal, PCI knew the berm mix required 10% clay by volume and included the cost of providing this material in its pricing. *See* Exh. 10. Its later failure to implement the Architect's interpretation of the berm mix detail demonstrated PCI's intransigence and lack of cooperation on moving forward with the Project. Through its actions and inactions regarding the berm mix, PCI breached the Subcontract. *See* Exh. 5 at Article 2.2, 2.3 and 6.1.

As with the Gravel Specification issue, PCI resisted the interpretation of the Architect and would not abide by the interpretation provided. This failure to abide by the Architect's interpretation of the Plans was in direct violation of the Subcontract. *See* Exh. 5 at Article 2.3. PCI agreed that the Architect's interpretation was final and binding; it was not a liberty to refuse to perform pursuant to the Subcontract because it disagreed with the Architect. PCI's requests for change orders had been rejected by the Architect and it was contractually obligated to perform in accordance with the Architect and Engineer's decisions. Its failure to do so was a material breach of the Subcontract and provided BGC one of the grounds for its

authorization to withhold PCI's payment on the Project. *See* Exh. 5 at Article 4.1. Where the parties agree the architect's determination is final, that agreement is binding and should be enforced. *See Marriott Corp.*, 26 F.3d at 1068. PCI simply refused to comply with the terms of its Subcontract and its failure to do so prompted the 48 Hour Notices and the Demand to Cure and the withholding of the its payment by BGC pursuant to the Subcontract.

iii. PCI's Failure to Completely Cure its Prior Breaches

PCI's breaches of the Subcontract forced BGC to withhold its payment in an effort to bring PCI into compliance with the Subcontract requirements. PCI remained intransigent and uncooperative with BGC's efforts to resolve PCI's materials issues, using these disputes in part as a basis for its failure to properly staff the Project.   BGC required not only that the #57 stone and berm mix issues be resolved, but that PCI fully remobilize on the Project and diligently prosecute the work  for a full week to cure PCI's default before payment. Because PCI totally abandoned the Project on December 3, 2013, after only working 3 days and without full crews, it never fully cured the breach of Article 10.1 of the Subcontract as described in the Demand to Cure sent to PCI pursuant to Article 11.2. *See* Exh. 43. PCI's claim of breach for non-payment lacks merit because all the causes for BGC withholding its payments were never corrected or cured. The obligation to make the payments did not arise due to PCI's failure to cure the breach. As a result, BGC's termination of PCI for cause after its total abandonment of the Project was proper. *See* Exh. 5 at Article 11.1. The payment bond claim against IFIC must fail and partial summary judgment should be granted to IFIC based upon PCI's prior uncured material breaches of the Subcontract. The only remaining issue would be whether there is anything due PCI, after deducting BGC's actual expenses incurred in good faith to complete PCI's work. *See Young v. Johnston*, 475 So.2d 1309, 1313 (Fla. 1st DCA 1985).

IV.    **CONCLUSION**

The undisputed material facts compel the conclusion that PCI's prior material breaches of the Subcontract authorized BGC to withhold its payments until it fully cured those breaches. PCI never fully cured its material breaches of the Subcontract. BGC properly terminated PCI for cause when it finally abandoned the Project. PCI's claim for payment under IFIC's bond must fail because those payments did not come due prior to its termination for cause. Therefore, based on the facts, law and argument presented herein, IFIC respectfully requests this Court grant partial summary judgment in favor of IFIC and against Plaintiff PCI on its claim on the payment bond for breach of contract.  The only potential factual issue remaining is whether a subcontract balance exists for payment to PCI as a defaulting subcontractor after BGC's completion of PCI's work.

Respectfully submitted,
s/Helen H. Albee
Helen H. Albee
Florida Bar No. 987257
Henrichsen Siegel, P.L.L.C.
1648 Osceola Street
Jacksonville, FL 32204
Telephone    :    (904) 381-8183
Facsimile    :    (904) 212-2800
E-mail :    halbee@hslawyers.com
service@hslawyers.com
*Attorney for Defendant International Fidelity Insurance Company*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I presented the foregoing for filing and uploading to the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record on this 30th day of June, 2015.

*s/ Helen H. Albee*
Helen H. Albee